UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
FRED SNITZER,

                Plaintiff,

-against-                                       NOT FOR PUBLICATION
                                                      **MEMORANDUM &**
                                                        **ORDER**

MICHAEL J. ASTRUE,                                09-CV-2705 (CBA)
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------x
AMON, United States District Judge:

      Fred Snitzer has filed suit against the Commissioner of Social Security, seeking review of the Commissioner's decision that Snitzer failed to carry his burden of proving that, because of a heart condition, he was not disabled within the meaning of the Social Security Act before September 30, 1974. 42 U.S.C. § 405(g). The Commissioner's decision rested principally, but not exclusively, on the fact that Snitzer had not produced any medical evidence that his heart condition impaired his ability to function at any time before 1978. The Commissioner has filed a motion for judgment on the pleadings, which the Court grants for the reasons that follow.

## BACKGROUND

### A. Facts

      Snitzer, who was born in 1929 and has a high school education, began working sometime around 1947 as a travelling carnival supplies salesmen. (Tr. at 638.) He quit that job in 1967 because, according to his testimony before an administrative law judge (ALJ), he experienced heart palpitations and chest pressure. (Id.) He next worked as an investment counselor, but he left that job because he "learned shortly that it wasn't for" him. (Id. at 639.)

1

Snitzer then worked, from about 1969 to 1972, as a data processing clerk for Metropolitan Life Insurance. (Id.) He left that job because he "wasn't producing[,] . . . wasn't being efficient," and although he "could have stayed another six months, another year," he "wouldn't have lasted." (Id. at 641.)

In 1973 and 1974, Snitzer lived abroad, traveling and teaching English for a bit in Iran. (Id. at 95–96, 177–78, 678.) He also worked for a week or two at a post office in Sydney, Australia. (Id. at 677.) In a December 1981 letter, Dr. Michael Schloss, a cardiologist whom Snitzer claims to have been seeing since 1978, said that Snitzer saw a doctor while he was in Iran and was told that he has a heart condition, but there are no medical records from this visit and no contact information for the doctor. (Id. at 188.) Snitzer testified that he was given no treatment and no medication after this consultation. (Id. at 641.)

Sometime in 1977, Snitzer went to the Strang Clinic because he had been feeling faint and having difficulty climbing stairs. (Id.) According to Snitzer's testimony before the ALJ, doctors there "found the same thing" that the Iranian doctor had and one doctor told Snitzer, "off the record," that he should see a cardiologist. (Id. at 641–42.)

Snitzer saw a cardiologist, Dr. Schloss, in May 1978. (Id. at 188.) Snitzer presented with complaints of exertional chest tightness, and a physical examination revealed him to be in rapid atrial fibrillation (cardiac arrhythmia). (Id.)

In June 1978, Snitzer spent a week at New York University Medical Center for treatment of his atrial fibrillation. (Id. at 108–120, 331–32, 484–525.) When admitted, Snitzer told the attending physician that he had been in his "usual state of health" until April 1978, at which point he experienced burning and tightness across his chest while carrying a suitcase up a flight of stairs. (Id. at 109–11.) He said that he had seen Dr. Schloss, who prescribed several drugs,

2

which helped his condition. (Id. at 111.) He also said that he had continued to experience palpitations during exercise and sometimes felt dizzy upon rising from a seated position. (Id.)

Snitzer saw Dr. Schloss again in August 1978 for an electrical cardioversion, which restored a normal heart rhythm (id. at 110, 115), and then again in June 1980. At that June 1980 meeting, Dr. Schloss administered an exercise stress test, during which Snitzer exercised without chest pain for more than ten minutes. (Id. at 180–87.) Dr. Schloss's contemporaneous notes show that he believed the test results to be "equivocal," "not clearly diagnostic of ischemia [reduced blood flow to the heart], but suspicious." (Id. at 181.)

The record also contains evidence that Snitzer was hospitalized at N.Y.U. in October 2000 (id. at 99–107); saw Dr. Schloss in May 2002 (id. at 163–66); was hospitalized at N.Y.U. again in November 2002 (id. at 442–63); saw Dr. Schloss again in May and September 2003 and February 2004 (id. at 153, 151, 159); and visited the N.Y.U. emergency room for left shoulder and upper back pain (most likely musculoskeletal) in May 2005 (id. at 423–41). At the September 2003 meeting with Dr. Schloss, Snitzer said that he had recently been doing some hiking in the Adirondacks.

### B. Administrative Proceedings

Snitzer first filed for disability benefits in June 1981 and alleged a disability onset date of March 31, 1974. (Id. at 40, 43.) The state agency denied benefits and the Commissioner affirmed the denial in September 1981. (Id. at 36, 40–41, 47, 49.) Snitzer did not appeal.

In 2000, the Commissioner reopened Snitzer's case pursuant to Dixon v. Heckler, 589 F. Supp. 1494 (S.D.N.Y. 1984), and Dixon v. Sullivan, 792 F. Supp. 942 (S.D.N.Y. 1992), aff'd sub nom. Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), which required the Commissioner to re-adjudicate certain claims because he had systematically applied a regulation to deny claims in

contravention of the Social Security Act. The Commissioner, because he could not locate Snitzer's file, asked Snitzer to submit information about medical sources. When Snitzer failed to do that, the Commissioner denied benefits in November 2000. (Id. at 49, 52–56.)

Snitzer requested review by an ALJ. That request was granted and Snitzer attended a pre-hearing conference in July 2003. (Id. at 567–80.) At that conference, Snitzer provided background information and discussed his cardiac condition, which he said was his only disability during the relevant period. He identified Dr. Schloss as his primary physician and also mentioned doctors in Iran and Israel whom he had seen about twenty five years ago. Snitzer could not name or provide any contact information for the foreign doctors.

The ALJ held a hearing on August 3, 2004 at which Snitzer, who was counseled, and an impartial medical expert, Dr. Richard Wagman (an internist with training in cardiology) testified. (Id. at 631–61.) Snitzer described his daily activities from the period between March 1974 and 1994, including his morning walks and afternoons spent playing chess throughout New York City. (Id. at 644–45.) With respect to his ability to work after March 1974, Snitzer admitted that he could stand and sit; bend at the waist and kneel; and carry groceries weighing up to 20 pounds. (Id.) But, he said, he "could not do anything" "on a steady basis." (Id. at 645.) He said that he could not "hold a steady job"—go to work "five days a week"—at any point after 1966 or 1967. (Id.)

Dr. Wagman opined that Snitzer's atrial fibrillation was not a serious inhibiter of daily activity and that, in 2002, his cardiac function seemed normal despite the fibrillation. (Id. at 650–51.) With respect to Snitzer's June 1980 stress test, Dr. Wagman said that the results were meaningless because Snitzer was taking digitalis at the time, and digitalis use can cause false positives (for ischemia). (Id. at 649.) Dr. Wagman also testified that, because "organic heart

4

disease doesn't stay stable," the fact that Snitzer had not had a serious cardiac episode (e.g. heart attack, congestive heart failure) in the last twenty years suggested that his heart condition was never that serious. (Id. at 658.)

Towards the end of the hearing, Snitzer's attorney asked the ALJ whether the attorney could try to secure a letter from Dr. Schloss, Snitzer's treating physician, that would explain Dr. Schloss's opinion of Snitzer's condition and his opinion of the June 1980 stress test. (Id. at 657–58.) The ALJ told the attorney, "Counselor, you absolutely may get his opinion on it[;] you absolutely may submit it to me." (Id. at 658.)

By letter dated August 21, Snitzer's attorney wrote the ALJ, stating that he was "confident that a post-hearing statement from Dr. Schloss will be obtained, but it has not been possible to get it yet." (Id. at 202–04.) The attorney asked the ALJ to continue to hold the record open so that Snitzer could secure the statement. (Id.)

On October 1, Snitzer's attorney wrote again, explaining that "it is expected that evidence from Dr. Schloss, addressing issues raised at the hearing, will be available shortly." (Id. at 226.) That letter never came (it is not clear why) and on October 13, Snitzer's attorney wrote the ALJ to inform him that he had been terminated over "fundamental differences in case strategy." (Id. at 227–28.)

In December 2004, the ALJ held a supplemental hearing at which Snitzer, represented by different counsel, testified again. He reiterated some of what he had said before about his limited ability to function after March 1974 and also explained that he had a history of heart problems. For example, he was asked to leave his high school track team and the U.S. Army gave him a "4F" classification (not qualified for uniformed service), both because of a heart murmur. (Id. at 682.)

Snitzer also offered the testimony of Dr. Mark DeLegge, an internist whose practice included some (about five to ten percent) cardiac patients. (Id. at 703.) Dr. DeLegge testified that the June 1980 stress test revealed ischemia and that Snitzer's digitalis use did not invalidate the results. (Id. at 705.) This opinion was consistent the written opinion that he provided pre-hearing, which stated that Snitzer "did have ischemic heart disease as diagnosed in 1978." (Id. at 248–54.)

The ALJ asked Dr. DeLegge if Snitzer's statements, made at the earlier hearing, about his ability to walk and stand and sit and kneel after March 1974 were inconsistent with what Dr. DeLegge understood his condition to have been at that time and Dr. DeLegge said no. (Id. at 710.) He testified also that he would not tell a patient with Snitzer's condition who claimed to be able to tolerate that level of activity not to exert himself. (Id.)

The ALJ issued an opinion in March 2005 in which he denied benefits, ruling that Snitzer needed to prove that he was disabled before September 30, 1974 (his date of last insured), and had not done so. (Id. at 349–61.) He concluded, notwithstanding what he identified as a lack of persuasive evidence, that Snitzer had a severe cardiac condition before September 1974 but that there was no evidence that the condition impaired his ability to perform sedentary work. For that reason, the ALJ found that Snitzer could perform his past relevant work, which was as a data processor (at Metropolitan Life). He found also that even if Snitzer could not perform that job, he had the residual functional capacity to perform other sedentary jobs existing in significant numbers in the national economy.

Snitzer asked for review and the Appeals Council remanded in June 2005, principally directing the ALJ to resolve two issues. (Id. at 377–80.) First, the ALJ should determine whether Snitzer had worked after September 1974; there was evidence that he had, which meant

6

that a presumption against disability might apply. Second, the ALJ should evaluate Snitzer's subjective complaints about his limitations during the period before September 1974. The Appeals Council also directed the ALJ to, among other things, allow Snitzer to develop the administrative record for the period at issue (i.e. pre-September 30, 1974).

The ALJ held a hearing on remand in November 2006 at which Dr. Harold Bernanke—an internist who identified himself as a cardiologist and had been on staff in the department of cardiology at Montefiore Medical Center for twenty five years—testified as an impartial medical expert. (Id. at 581–630.) Dr. Bernanke opined that Snitzer's heart condition did not meet or exceed the disability listings in 1978 or 1980 and that, even if (based on the June 1980 stress test) Snitzer's condition met or exceeded the listings in 1980, it "would honestly be impossible to say" whether his condition met or exceeded the listings before September 30, 1974. (Id. at 594–95.) Dr. Bernanke further testified that, based on the medical record as a whole, he could not offer a retrospective opinion as to whether Snitzer's heart condition met or exceeded any listings before September 30, 1974. (Id. at 626.)

After cross-examining Dr. Bernanke, Snitzer's attorney, in closing, argued that the record showed that Snitzer "ha[d] cardiac pathology" in 1978 and that "it's reasonable to relate the problems he had back to 1974, at a minimum, despite the testimony of Dr. Bernanke." (Id. at 627.)

The ALJ denied benefits in an opinion dated May 2007, again ruling that Snitzer had not proved that he was unable to perform his past relevant work as a data processing clerk before September 30, 1974. (Id. at 19–30.) The ALJ found that the record contained "no objective medical evidence to support the claimant's claim of disability since March 31, 1974" and that "of particular note is the absence of contemporaneous evidence documenting that the claimant

complained of, or sought treatment for, any symptom or medical condition prior to April 1978, more than three years after his disability insured status expired." (Id. at 27.)

The ALJ observed also that when Snitzer first saw Dr. Schloss in May 1978 he reported no medical history prior to April 1978 and, upon his admission to N.Y.U. in August 1978, Snitzer stated that he had been in his "usual state of health" until April of that year. (Id.) The ALJ also noted that there was no contemporaneous evidence that Snitzer's daily living was impaired at any point before September 30, 1974 or that his decision to stop working was "anything more than a personal choice made by an individual who, admittedly according to his testimony at his first hearing, was able to live off his savings during the period at issue." (Id.)

The ALJ expressed doubts about Snitzer's description of his impairments. He found Snitzer's recent hiking in the Adirondacks inconsistent with his claim that he had been suffering a serious heart condition for more than twenty years. The ALJ also explained that Snitzer's decisions not to seek treatment for his heart condition or see a cardiologist until April 1978, not to file for benefits until nine years after he last worked and seven years after his disability insured status expired, and not to appeal the 1981 denial of benefits were inconsistent with his testimony. (Id.)

The ALJ concluded that "[a]fter consideration of the entire record before" him, "there appears to be no medical basis for finding that the claimant's overall ability to stand, walk, sit, lift, or carry was significantly compromised by cardiac symptomatology on or before September 30, 1974." (Id. at 28.) The ALJ found that, "at the very least," during the period before September 30, 1974, Snitzer retained the residual functional capacity "to stand or walk up to 2 hours in an 8-hour day, to sit 6 to 8 hours in an 8-hour day, and to lift, carry, push, or pull up to 10 pounds occasionally." (Id.)

Moreover, there was "no evidence of any medically documented impairment or symptom that imposed non-exertional postural, mental, manipulative, communicative, visual, hearing, or environmental limitations on him . . . that would have eroded his sedentary occupational base." (Id.) Given those findings, the ALJ decided that Snitzer could have performed his past relevant work as a data processing clerk, which work the ALJ found "was performed primarily in a seated position and did not entail significant lifting or carrying or more than occasional walking or standing." (Id. at 29.)

Although not necessary, the ALJ further concluded that even if Snitzer established that he was unable to perform the job of data processing clerk before September 30, 1974, Snitzer still was not entitled to benefits because he "had the residual functional capacity to perform other jobs existing in significant numbers in the national economy, as [he] was only 45 years of age and thus a 'younger individual' when his insured status expired, and as he had a high school education." (Id.)

### C. Federal Court Proceedings

After the Appeals Council denied review, Snitzer filed this lawsuit, in June 2009, seeking review of the Commissioner's denial of benefits. In December 2009, the Commissioner served his motion for judgment on the pleadings, which Snitzer opposed.

In February 2011, the Court held oral argument on the motion, at which Snitzer, through new counsel, principally argued that the ALJ erred by not securing Dr. Schloss's opinion about Snitzer's condition before September 30, 1974. He urged a remand for the purpose of securing that opinion.

Counsel acknowledged that the possibility of securing an opinion from Dr. Schloss had been discussed at the August 2004 hearing and that Snitzer's then attorney had not, for whatever

9

reason, submitted an opinion, even though he asked (and received) permission to supplement the record. Counsel also said that he could not explain why Snitzer's then attorney had offered testimony from Dr. DeLegge, an internist who had reviewed Snitzer's medical records, instead of from Snitzer's treating cardiologist, Dr. Schloss.

The Commissioner argued in response that Snitzer had offered no medical evidence about his condition before his insured status expired, that the ALJ had met his responsibility to develop the record, and that a remand would accomplish nothing.

The Court informed the parties that, whatever else it might do, it would not remand unless it could be sure that Dr. Schloss was available to provide an opinion about Snitzer's condition before September 30, 1974. Because Snitzer's attorney could not be sure whether Dr. Schloss was still practicing or otherwise available to provide an opinion, the Court asked counsel to look into the matter and to write the Court, within a week, explaining what he had discovered.

Counsel wrote the Court on February 14 and said that although Dr. Schloss continued to be listed as a physician practicing in New York, Snitzer had told counsel "not to ask Dr. Schloss to testify in this case." Consequently, counsel was "not now in a position to assure the Court that Doctor Schloss will be available to provide testimony after remand."

At a subsequent telephone conference to discuss the letter, counsel clarified that it was his understanding that Snitzer did not want him to contact Dr. Schloss about his case. Counsel also informed the Court that Snitzer had recently terminated him and asked that he no longer represent him in federal court.

Snitzer himself wrote the Court by letter dated February 21, 2011. He stated that he had decided to represent himself and that the "reason for this change came about over the issue of [his] cardiologist, Doctor Michael Schloss, M.D., giving testimony." Snitzer explained that he

10

had decided not to ask Dr. Schloss to provide testimony and that this was not a "compulsive or capricious" decision; indeed, it was a decision that he had "made many years ago, only after careful consideration, and [his] attorneys have known this."

Snitzer explained that he did "not wish to chance doing anything that might risk impairing or blemishing" his relationship with his doctor and stated his belief that it is not "proper for a patient to ask a doctor for the testimony that [his] lawyers wish [him] to go to Dr. Schloss for." Snitzer confirmed that he wished to continue his case and stated that he "must remain hopeful that the evidence already presented will be sufficient."

## DISCUSSION

Snitzer's principal arguments in this action are that the ALJ did not adequately develop the record with respect to his physical impairments before his date of last insured; erred by determining that Snitzer retained (before September 30, 1974) the residual functional capacity to perform sedentary work; and did not adequately develop the record with respect to Snitzer's past relevant work when he determined that, in view of his residual functional capacity, Snitzer was capable of working as a data processing clerk. For the reasons that follow, these arguments are rejected.

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence, or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted); see also 42 U.S.C. § 405(g).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence

from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999). "Substantial evidence is more than a mere scintilla. It means such relevant evidences as a reasonable mind might accept as adequate to support a conclusion." Zabala v. Astrue, 595 F.3d 402, 408 (2d Cir. 2010) (internal quotation marks and brackets omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [a court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

Courts do not, however, defer to legal conclusions, and an ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted); see also Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003).

## B. Record Development

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act," but "because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (internal quotation marks and brackets omitted); see also Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). Relevant here, the ALJ retains this duty "[e]ven when a claimant is represented by counsel." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

Here, the ALJ fulfilled this obligation. He first had his assistant conduct a pre-hearing conference with Snitzer to determine what records the ALJ might need to adjudicate Snitzer's claim and where those records might be located. (Id. at 567–80.) He then served a subpoena on N.Y.U., requesting Snitzer's full medical records. (Id. at 98.)

12

After the first administrative hearing, the ALJ held the record open so that Snitzer's attorney could provide an opinion from Dr. Schloss, which he never did, instead offering the written and oral testimony of Dr. DeLegge. After the Appeals Council remand, the ALJ again served a subpoena on N.Y.U., this time directing the subpoena to Dr. Schloss. (Id. at 419.) N.Y.U.'s records department returned the subpoena, along with some additional medical records.

Snitzer's only real complaint about these efforts—which he offered before the post-oral argument developments described above—is that the ALJ never secured an opinion from Dr. Schloss. Although Snitzer's post-argument letter appears to confirm that he would have instructed the ALJ not to ask Dr. Schloss for an opinion, the Court will assume that Snitzer has not conceded this argument and still believes that the ALJ should have requested an opinion.

Nevertheless, the Court concludes that the ALJ fulfilled his obligations. After the first administrative hearing, Snitzer's attorney told the ALJ, more than once, that he would secure an opinion from Dr. Schloss, and that is a representation upon which the ALJ was entitled to rely. Cf. Jones v. Sullivan, 949 F.2d 57, 61 (2d Cir. 1991) ("[I]t is apparent that Jones was relying on the ALJ to secure the necessary information from her treating physicians.").

And when—in advance of and then at the supplemental hearing—Snitzer offered only the testimony of Dr. DeLegge, the ALJ could reasonably have concluded that either Dr. Schloss was unwilling or unable to provide an opinion about Snitzer's condition during the relevant period, or that Snitzer had decided for some reason not to provide the opinion that Dr. Schloss was willing to offer.

Snitzer has not persuasively explained why, at that point, the ALJ was not entitled to adjudicate Snitzer's claim without an opinion from Dr. Schloss. The Court concludes that he was. See Moscatiello v. Apfel, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001) (the ALJ "then

13

afforded plaintiff's counsel the opportunity to obtain a more comprehensive report from Dr. Hahn . . . and acted only after counsel reported that he had contacted Dr. Hahn, who could provide no further information that might illuminate plaintiff's condition during that earlier time period").

Even if this analysis is wrong, and the ALJ should have requested an opinion from Dr. Schloss, the Court declines to remand with instructions that that request be made. This is because Snitzer has now made clear that he does not want to involve Dr. Schloss in these proceedings and wishes his entitlement to benefits to be decided without evidence from his treating cardiologist.

### C. Residual Functional Capacity

A claimant's residual functional capacity is his "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. It is the most a claimant can still do despite his or her limitations." 20 C.F.R. § 416.1545(a)(1). As the Court has said, the ALJ determined that Snitzer failed to prove that he did not retain the ability to perform sedentary work, which "is the least rigorous of the five categories of work recognized by [Social Security Administration] regulations." Rosa v. Callahan, 168 F.3d 72, 78 n.3 (2d Cir. 1999) (internal quotation marks omitted); see also Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) ("By its very nature, 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required.").

The ALJ's determination in this regard is well supported by the record. First, there is no objective medical evidence from before the date last insured (i.e. September 30, 1984) to indicate that Snitzer was impaired during the relevant period. This is significant because, where, as here, the ALJ has adequately developed the record, the Commissioner "is entitled to rely not only

14

upon what the record says but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983); see also Peterson v. Gardner, 391 F.2d 208, 209–10 (2d Cir. 1968) (the Commissioner "could properly refuse to find a disability in the absence of any objective medical evidence of plaintiff's [condition] at the time of the claimed disability"); Wilson v. Apfel, No. 97-CV-1410, 1998 WL 433809, at *7 (E.D.N.Y. July 30, 1998).

Second, Dr. DeLegge's opinion about whether Snitzer had ischemia at some point after 1978, which is an opinion upon which Snitzer places great emphasis, is not a retrospective opinion about Snitzer's condition before September 30, 1974. For that reason, it is not especially probative of whether Snitzer is entitled to disability benefits. See Jones, 949 F.2d at 60; Moscatiello, 129 F. Supp. 2d at 489; Vitale v. Apfel, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) ("While the existence of a pre-existing disability can be proven by a retrospective opinion, such an opinion must refer clearly to the relevant period of disability and not simply express an opinion as to the claimant's current status.").

Moreover, even if the record did contain a retrospective opinion favorable to Snitzer, that opinion would not be strongly probative because it would not—given the absence of medical evidence from the relevant period—be "based upon clinically acceptable diagnostic techniques." Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996); see also Vitale, 49 F. Supp. 2d at 143 ("Additionally, Dr. Shapiro did not base his retrospective opinion of disability on any medical findings from the period . . . .").

Third, the ALJ did not err in declining to base a disability finding on Snitzer's testimony about the severity of his heart condition and the limitations it placed on his ability to work before September 30, 1974. As a general matter, a claimant's testimony that he was unable to work during the relevant period is not enough alone to prove an entitlement to disability benefits.

Moscatiello, 129 F. Supp. 2d at 489; Vitale, 49 F. Supp. 2d at 143 (citing Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990), and Gonzalez v. Schweiker, 540 F. Supp. 1256, 1258 (E.D.N.Y. 1982)).

And this is especially true where, as here, there are good reasons to doubt the claimant's testimony about his disability. Most significantly, as the ALJ stressed, at no point before 1978 (years after his disability insurance lapsed) did Snitzer seek medical treatment for a heart condition that was, according to him, so serious that it prevented him from doing any work at all. See Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989); Moscatiello, 129 F. Supp. 2d at 489 ("The Commissioner also was entitled to consider plaintiff's failure to seek treatment for her mental condition before her last-insured date, or indeed, until 2 ½ years later."); Vitale, 49 F. Supp. 2d at 144 ("Plaintiff's failure to seek medical treatment during the period at issue undercuts a finding of disability.").

Moreover, Snitzer offered no persuasive reason for his failure to seek treatment, such as his inability to pay or the fact that he had previously sought treatment and found it unhelpful. Cf. Shaw v. Chater, 221 F.3d 126, 133 (2d Cir. 2000) ("Given the many times plaintiff was treated between his 1977 accident and March 1982, and that his condition did not improve, it was not unreasonable for him to discontinue those treatments, particularly in light of his testimony that he could not afford further medical care.") (citing Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995) (holding that claimant cannot be denied benefits for failing to obtain treatment he could not afford and collecting cases)); Campbell v. Astrue, 596 F. Supp. 2d 446, 454 (D. Conn. 2009) ("The law is clear, however, that an ALJ may not draw negative inferences from a claimant's lack of treatment without considering any explanations the claimant may provide.").

Additionally, the ALJ did not err in concluding that Snitzer's description of his daily

16

activities, including morning walks and afternoons playing chess throughout New York City, as well as the fact that he had recently been hiking, undercut his claims about his inability to work in 1974. See, e.g., Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009); Perez v. Barnhart, 440 F. Supp. 2d 229, 234–35 (W.D.N.Y. 2006).

In sum, the Commissioner's conclusion that Snitzer did not carry his burden of establishing an inability to perform sedentary work during the relevant period is supported by substantial evidence. That Snitzer may have had a heart condition since he was a child is not enough alone to establish his entitlement to benefits. Moscatiello, 129 F. Supp. 2d at 490 ("That petitioner may have had mental and emotional difficulties from an early age is not determinative.").

**D. Ability to Perform Past Relevant Work**

Snitzer's final argument is that the ALJ, in determining that because of his residual functional capacity Snitzer retained the ability to perform his past work as a data processing clerk, did not adequately discuss the demands of that job. The Court agrees that the ALJ had an obligation to "make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work." Kerulo v. Apfel, No. 98 Civ. 7315, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999) (citing, e.g., Sivilay v. Apfel, 143 F.3d 1298, 1299 (9th Cir. 1998)). The Court concludes, however, that the ALJ did this.

The ALJ's inquiry into the nature of Snitzer's work as a data processing clerk, although not ideal, was adequate. The ALJ had Snitzer's testimony that his past work was not "physical work" and that it was "work at a desk." (Id. at 640, 645.) He also had Snitzer's attorney's description of the job as "sedentary." (Id. at 364.) Although the ALJ could have attempted to secure further information from Snitzer, the job of data processing clerk is described in the

Dictionary of Occupational Titles, § 203.582-054, and there is no suggestion that Snitzer performed the job in an unusual manner such that it was inappropriate to have relied on that source.

The Court finds it significant that Snitzer has offered no reason at all to think that the ALJ misunderstood the nature of his past work or that further inquiry into the nature of that work would have revealed any useful information. See Stanton v. Astrue, No. 07-CV-803, 2009 WL 1940539, at *10 (N.D.N.Y. July 6, 2009) ("However, Plaintiff does not cite any authority . . . tending to call into question the ALJ's determination regarding the exertional requirements of the past relevant work."); cf. McGowan v. Astrue, No. 07-CV-2252, 2009 WL 792083, at *12–13 (E.D.N.Y. Mar. 23, 2009) (ALJ erred when, without justification, she "disregarded plaintiff's explanation that his prior job required medium exertion").

Even if the ALJ did not do enough to investigate the requirements of Snitzer's past relevant work, that error is harmless. As the Court has said, the ALJ's residual functional capacity finding is supported by substantial evidence. And that finding, as the ALJ further explained, easily supports a finding of non-disability at "step five" of the disability determination. See Rules 201.21 and 201.27 in Table No. 1, Appendix 2 to Subpart P, Regulation No. 4.

For this reason, remand is unwarranted even if the ALJ should have done more in investigating Snitzer's past relevant work. See, e.g., Stafford v. Astrue, 581 F. Supp. 2d 456, 460 (W.D.N.Y. 2008) ("while I find that ALJ Brounoff's conclusion concerning plaintiff's ability to return to her past relevant work is not supported by substantial evidence, the Grids nonetheless direct a finding of 'not disabled' based upon the plaintiff's RFC, the determination of which was supported by substantial evidence in the record.").

## CONCLUSION

For the reasons stated, the Commissioner's decision is affirmed. The Clerk of Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2011

/Signed by Judge Amon/

Carol Bagley Amon
United States District Judge